Good morning, Your Honors. May it please the Court, my name is Matthew Harrison for the petitioner, Carlos Flores-Cruz or Dennis. And I'm just a little deaf. I'm sorry. All you've got to do is speak up. As I said, Your Honors, may it please the Court, my name is Matthew Harrison for the petitioner, Carlos Flores-Cruz or Dennis. We ask to reserve three minutes for rebuttal. Okay. And we've rearranged the timing to give you 15 minutes. Given the nature of this case, we'll just kind of see how the time goes. We'll make sure everybody gets enough time to say what they need to say. Thank you, Your Honor. For the reasons set forth in our briefs, we request that the Court vacate the ruling of the Board and reinstate the ruling of the IJ. Today I'll address two points in support of our positions, and we rely on our briefs for our other arguments. First, and briefly, Your Honors, the Board violated Dennis's due process by considering an issue that was not properly before it. That issue is whether Honduran street children constitute a particular social group under the INA. But isn't that the ground on which he sought asylum? That is the ground upon which we sought asylum. So I don't understand the argument as to why that issue was not before the Board. It's been before the administrative agency since the hearing in front of the immigration courts. That was the ground on which it sounds. Your Honor, it was before the Board in the initial, the court's, the Board's hearing, before the IJ and before the Board's hearing over five years ago, but the Board punted on that issue. It did not consider the issue, and therefore let it go. Instead, it considered the issue of whether, it said even if Honduran street children constitute a particular social group, that Dennis did not prove persecution. So basically that issue is not in play. Well, is it your position that the last time this case was before us, we remanded on an open record? Or was it a limited remand? And if so, what was the scope of that limitation? Well, Your Honor, as the Governor's argued, that the Board on remand in this case can consider any issue that it sees fit. But that's contrary to this Court's precedent under Mendez-Guitarez, where the Board is not entitled to remand beyond the Court's order. Now here, the Court did not specify the reasons for the remand in its order. Yeah. Now, I don't know the position of my colleagues on this, because we ordinarily don't confer on any sort of merit-based thing before we come out here. So at the moment I'm speaking only for myself. The remand order from this Court was just a one-line remand without specifying any ground. So to the extent that we can infer some ground or limitation on the remand, we have to do it by looking at the moving paper from the government that sought the remand. And as I read that paper by the government, it was about three pages long, it's very hard to be that precise about any particular limitation. And I'm unwilling, unless persuaded otherwise by you or by my colleagues, to say that the remand was so limited that they couldn't address the question, which had been pre-permitted the first time around. The first time the Board got it, the Board said, even if this is a protected social group, da-da-da. So for me, I think the question was open on remand. Well, with respect, Your Honor, we believe that this Court's order endorsed the government's motion and set the scope for the remand. But I'll move on and say even if the Court or the Board was able to consider that issue, that Dennis did not have a fair opportunity to address it at the Board level. As the record reflects, the simultaneous briefing, Dennis addressed the issues he felt was properly before the Board, inspected the government to do the same. Instead, the government briefed the new issue, and Dennis didn't have a chance to respond. I'd prefer if you don't mind addressing the issue itself. Okay. That is to say, should we reverse the Board on this question as to whether or not Honduran street children should be considered a social group? Okay. On that issue, Your Honor, we do feel that the Board erred with regard to whether or not Honduran street children do constitute a particular social group on the INA, and that issue must be considered de novo by this Court. Now, there's no debate here that the Board applied the wrong legal standard when it applied the matter of Acosta, because that's not the law of the circuit. The circuit follows Hernandez Montiel, which holds that a particular social group can be bound by an immutable characteristic or a voluntary association. What's immutable about a member of a Honduran street child group? I'm sorry? What is the immutable characteristic? What never changes? Well, Your Honor, with respect, as some courts have held, youth in and of itself is not immutable. In and of itself is not immutable. And courts have held, and this Court has held, that wealth in and of itself is not immutable. However... The problem here is that your client has aged out, has he not? Yes, and that is one argument the government makes, but... Is he now, what, 23, 22? He's 22 years old. 22. So let me first address your question about immutability, and then I'll address your question about aging out. We would argue that Honduran street children are not just based on youth. They're not just based on wealth. It's a confluence of circumstances and shared experiences that forms this group. And we would define it as, number one, Honduran, number two, youth, number three, homelessness, number four, indigence, and then abandonment, societal neglect, and a history of abuse. And then to delimit this group even smaller, it's narrowed by the fact that these folks, especially Dennis, refuse to join Honduran gangs, contrary to the case law that the government has presented to you. So all these taken together, Your Honors, are immutable. Whereas, as this Court has held, age itself is not immutable and wealth itself is not immutable. But here you have a bunch of different factors that forms this narrow group. And with respect to Dennis' age, first of all, as this Court has held, the facts must be taken at the time of the petition for asylum, the request for asylum back six years ago when he was 17. And that case is Avitova-Ellisova, and that was with respect to a well-founded fear of future persecution. But I would argue that that's the same case here. Second of all, it's of no comfort that he is 22. As the record reflects at pages 146, 154, and 923, youths as old as 24 are murdered and persecuted and face the same harms that younger children face on the basis of this group. So to argue that he will eventually get older or he's aged out simply is of no comfort or consequence. So you think his current age keeps him within the definition of Honduran youth, homeless youth? I do, Your Honor. I do feel it falls within that. And you really don't want another remand, therefore? I do not think there should be. Because he's going to get older and older and older. Exactly. And I find it sad, Your Honor, that the government argues on the one hand that there should be repeated remands and on the other hand that he's aging out. Where is he now? There's stuff in the record that he was in school in Centralia. Is that still true? As far as I know, that's true, Your Honor. I thought he was in high school in Centralia at the time of the hearing. I hope he's not still in high school in Centralia. No, he's graduated from high school. The IJ also ordered a grant of humanitarian relief. Could you tell me a little bit about that? I mean, it seems to me that this may be a case where that's a perfectly appropriate thing to do. And would that be a way to resolve this case without having to reach this thorny issue of whether or not it constitutes a social movement? Your Honor, that was something that wasn't briefed, and I am not prepared to go into detail about it, but I agree with you that it is a perfect example of that. We'll ask Mr. Cunningham. He's been around a while. I don't know what he thinks. But I do agree with that statement that it is a perfect example of where something like that should be granted. I just don't know anything about it, and apparently you suffer the same lack of knowledge. I limited my argument to what was in the record in the briefing, so I apologize, Your Honor. But I can certainly... You were specializing this morning in asking counsel questions. They weren't prepared to answer. I apologize. Go ahead. Well, perhaps during the government's argument I can look it up and come back on the line. Go ahead. Okay. Your Honor, with respect to the issue of whether Honduran street children constitute a particular social group, I basically wanted to address the voluntary association problem, because that's something that the Board did not consider. The voluntary what problem? Voluntary association prong of Hernandez Montiel. Association. Of Hernandez Montiel. The government here argues that Honduran street children do not constitute a voluntary association because they don't choose to live in the streets. But this completely misses the point. As the IJ observed at page 627 of the record, they form voluntary associations based on a common history of domestic abuse and the government's indifference to that neglect. Because of these experiences, they search out other similarly situated children and form these groups to survive. For example, at pages 7, 48, and 49 of the record, it states, in order to survive, they create strong social bonds with those who are like them. These bonds impart common characteristics fundamental to this group's identity. They share a history of abuse and neglect, as I stated. Once driven to the streets, they share the common characteristics of being young, poor, homeless, and hungry. Honduran society stigmatizes them on this basis, seeing them as criminals with no social worth. And because of these shared characteristics, Honduran street children even view themselves as a cohesive group to survive. And like I said, it is a choice, because unlike children who seek to join the gangs, these children seek not to join the gangs voluntarily. Well, and group here is an odd word. To be a member of a group, if we take it out of the Honduran street children, doesn't necessarily mean that you know or associate closely with other members of the group. It means you fall into a certain category. So I'm not sure that if we were to find there are 100 Honduran street children, 95 of whom have a cohesive group, and the other 5 are sort of schizophrenic and lonely and hide out by themselves under the bridge, that those 5 are not part of the group. They're part of the category. Right. It's not, for example, like a union, Your Honor. It is a group that some members do not know each other, but they seek out each other in the streets to survive. Just as gang members, people who choose to be in gangs, seek out each other to survive. But it's completely different. It's the opposite. And it's immutable, because it's basically their only way of surviving, because they have nothing else. The government has neglected them. Their families have neglected them. And the police seek out and kill them. Assuming that they're a social group, what then? Has the deprivation and harm that he's suffered, has it risen to the level of persecution? We believe it has, Your Honor. Because? Well, first of all, let me just add that his credibility is not at issue. So the record is what it is. He's witnessed robbery and murder. He's been harassed and beaten by the Honduran police. He's been subjected to a constant fear of ad hoc death squads that murder these children. He's been threatened by the gangs. He's been even shot at by the gangs. So I think it has risen to a level of past persecution. And with respect to the three- Now, why was he shot at by the gang? Well, he was shot at by the gang member because he was seen at a bar with the gang member's wife. Yeah, I might want to put that one aside. Okay. Even with respect to that one, as the record reflects, he refused to join the gangs, and he's persecuted on that basis. Not only is he persecuted by the gang that he didn't join because he wouldn't join it, but also by the other major gang in Honduras because they think he's part of that gang. Now, you may be aware that there's been a remand in the Third Circuit on the question of social group. When the social group was defined in a related but distinct way, that is to say, the social group alleged in that case was Honduran street children who have refused to join a gang and are then subject to retaliation or punishment by the gang. And in this case, you're pushing a little bit on refusing to join a gang and being punished for that reason, but you've also got, well, irrespective of refusing to join a gang, retaliation or punishment or harm imposed by the government. Focusing for the moment only on harm by the government or harm by gangs that the government is unable to control, unrelated to refusal to join the gang, what do we have in terms of how high, what's the level of persecution? Of Dennis? Yes, of your client. The level of past persecution, Your Honor? Yes, correct. Again, he's witnessed robbery and murder. He's witnessed others murdered, his friends. He's been beaten and harassed on the basis of the fact that he's on the street, and he's been threatened and beaten by gangs because the government cannot control those gangs. And how realistic is the threat of severe injury or death at the hands of the police, of someone in his position? The level is high, Your Honor. As the record reflects, at pages 144 on, I won't give you a bunch of page numbers, they're dropping like flies. There's ad hoc death squads, vigilante killings of youth. These aren't gang members they're killing. These are youths on the basis of the fact that they're on the street. This is a socially visible group. They're murdered because they're a nuisance. They're a nuisance to the society, they're a nuisance to business owners, and they're killed on that basis. It's just something the government cannot control. Okay. Why don't we hear from the government? You're down to 25 seconds or so, but we'll make sure to give you a good chance to respond. Thank you very much, Your Honor. Thank you, Your Honors, and good morning. Judge Fletcher, it's nice to see you again. Judge Tallman, Judge Gertelsman, good morning. I'm John Cunningham from the Department of Justice, appearing on behalf of the Attorney General. We, of course, urge the Court to deny this petition for review. I will get right into the proposed social group issue.  I'm going to be brief, and I'm going to try to keep the argument that seems to be disposed to have argument this morning focused on that question. There are two particular problems that we address at length in our brief. First, with respect to the voluntary association side of the Court's test for proposed social group. The Court's cases that have endorsed a voluntary association have focused on things such as police officers, union members, truck drivers, military officers. The Cordiaver case in the Second Circuit, which I think my colleague cited in his reply brief, focused on defected former KGB agents. In every case, there was a clear decision by the applicant for asylum to join an identified and established group, and because he made that voluntary choice to join that group, he became targeted for persecution. In the case of police officers and military officers, the threat would typically come from guerrillas. In the case of union members, truck drivers, it would more often come from the government. But in every case, there was a clearly identifiable and reasonably limited group that the Petitioner, the affiliate family. Of course, that's not the only way you can get approval. Of course not, Your Honor. But here, the notion that someone voluntarily joins a group that is made up of people who are poor and people who are homeless simply does not fit within the Court's recognized jurisprudence. It's interesting to look at my colleague's July 7th letter, in which he replied to my Rule 28J letter, in which he used the following adjectives to describe the Petitioner's proposed group, and he's, I think, quoted it again this morning. He mentions poverty and other shared characteristics that are fundamental to this group's identity. Youth, homelessness, indigence, abandonment, social neglect, and a history of mental, physical, and often sexual abuse at the hands of their families. Who volunteers for any of that? And who volunteers to be a youth? Well, who volunteers to be a woman subjected to general mutilation? That is to say, volunteering is not essential for all groups that we consider as groups. That's correct, Your Honor. That, it would be, I think there, Your Honor, it would not be a voluntary association. I think Your Honor is alluding to the Court's decision in the Mohamed case. Well, what I'm saying is I don't regard volunteering for membership as essential to a definition of group. It's not essential, Your Honor, if you tip over to the other side of the equation and talk about immutable characteristics. And that is where the problem in the litigation of this case has arisen. Although my colleague has focused on the Board's alleged error in failing to address voluntary association, the truth is this case has been litigated almost entirely on the other side of the Board's, the Court's test, which is immutable characteristics. Female genital mutilation would be an immutable characteristic. It happens to you. You cannot undo it. All the other aspects of the petitioner's life that my colleague has talked about in his pleadings and this morning fall on the immutable characteristic side of the equation. My point is simply that the Board can't be faulted for failing to address the voluntary association half of this Court's definition of a cognizable particular social group. Let me ask you this. Obviously, we have this decision by one Board member that Honduran street children are not a social group within the meaning of the statute. That's correct. We have several other one Board member decisions that go the other way, although sometimes with a little ambiguity. One of them was the child was not only a street child, but also the child of people who had been murdered by the guerrillas when they deserted the guerrillas. I mean, I understand there's some qualifications to all of those. Are there any cases decided by the Board except this one where we have a Board member saying that Honduran or other South or Central American street children are not a social group? I don't know, Your Honor. This Court's- I assume you've looked. Yes. And you found none. I found none. Okay. The question is, I mean, this was pointed out that there have been past Board decisions by one member of the Board that did find or appeared to find that a similar social group was, in fact, cognizable. Petitioner argues in his briefs that this is an indication of that this decision was wrong. We simply point out in our brief that as a matter of law, it doesn't matter. None of these decisions are binding precedent for purposes of- Does any of the decisions deserve skid more deference? This one does, Your Honor, because it's persuasive. And how about the others? They're not persuasive. Oh, because you don't- I think it is fair. I don't mean to be flippant, Your Honor. I think that it is fair to say that this decision- I'm sorry, I didn't quit. No, I was actually going to expect a bad answer. I think it's fair to say, any neutral reader would say that this Board decision is at least better reasoned. It's more complete than the Board orders cited by my colleague. Those are much shorter, and as you point out, at least one of them really turns on an imputable political opinion. No, it does not turn on that. They're alternate. They go together. Yes, they go together. The difficulty with social group cases is always to try to define the group in such a way that it gives a particular social group a meaning that is separate and apart from the other protected categories under the asylum laws, particularly political opinion and religion. Because there again, you're joining something voluntarily, so you have the voluntary association part of this Court's definition. But if the particular social group definite or criteria in the asylum laws is to have real meaning, we have to look at it in such a way that doesn't blend in or bleed into the other categories. This particular proposed social group doesn't involve political opinion, doesn't involve religion. It should stand alone. Our point is that it's so broad that it should not be a cognizable group, because street children, youth, poverty, none of those are immutable characteristics. Now, the ---- When you say so broad, because there are so many Honduran street children, or what do you mean by broad? The ---- thank you, Your Honor. That's a good question, because my colleague has argued that the government seems to be implying that there should be a numerical limit on any cognizable social group. That if, for example, you have 5,000 or fewer, you're okay. If you're over 5,000, you're not okay. That's not the argument. The argument is that the excessive numbers result from a definition that's too broad. The broadness is sort of a final control. You say excessive numbers. What are the numbers? Well, Casa Alienza estimates, this is in the record, that there are 8 million homeless children throughout Latin America, 25 million worldwide. So in ---- But it may be that in other countries, they're not treated so badly as they, at least the record seems to show, as they are on Honduras. And it may be that some of those would be merely poor children living on the street, rather than a group, because they may not be treated as such by the authorities. Yes, Your Honor, that's true. But that's not the definition that you're asked to approve here. One of the problems with any social group case is that the definition tends to open and close as the litigation wears on. You are being asked to endorse Honduran street children. You are not asked to endorse Honduran street children who have suffered XXXXX. That has been put before you. But that's not the definition that the case was preceded on. It's the experiences of past neglect, police beatings, murders by gang members are adjectives that have been added to the proposed group for purposes of this argument. But they're not the group that you are being asked to endorse. The group is Honduran street children. I guess the concern that that raises for me is if we were to define it as broadly as the petitioners are asking, would that include people from Darfur who are basically not protected by their government, who suffer the same sorts of indignities and suffer from famine and attacks by bandits even on refugee camps? I don't know where you would draw the line. Two answers to Your Honor's question. First, yes, certainly the door would be wide open to that kind of an argument. Second, and we make this point in our brief, a proposed social group should not be defined by the harm that has befallen members of the group. We made that point in the Escobar case in the Third Circuit, and other courts have endorsed it. I don't think this Court has directly. But the argument is that the group has to exist discreetly and identifiably before the harm comes to them. And that makes sense because in order to be targeted for persecution, you have to be identifiable in the eyes of the persecutor, whether it's the government or guerrillas. Your group, whether it's military officers, police, union members, truck drivers, has to be seen, has to be visible in the eyes of the persecutor. You can't say I was a member of a recognizable social group because I was beaten, because I was abused, because I was threatened by gang members. Didn't we address this area in our decision in Lolong versus Gonzales involving the Chinese Christian women in Indonesia? And in Lolong, we said that that was too broad a group that the – that while it was certainly an identifiable group, that you still had to show individual acts of persecution. It wasn't enough to show that Muslims predominated in Indonesia, the government was primarily, you know, Muslim, and that they weren't adequately protecting Chinese Christian women from these attacks. That's accurate, Your Honor. And two points. One, there again you have another category of under the asylum laws entering the case, Christian women. Second, that issue was whether there had been a pattern or practice of persecution against that group. So, again, my point is the same. Christian women in Indonesia is certainly narrower than street children. But I think Christian Chinese women in Indonesia, that is a group. The question then is whether or not the individual in that group has suffered persecution. That's correct, Your Honor. That was the issue decided by the court in Lolong, considered by the court in Lolong, whether there had been a pattern or practice of persecution against that group. But Chinese Christian women in Indonesia, I think, is common ground. We consider that to be a group. Yes, I think that's fair, Your Honor. But there are limitations there that aren't existing here. It's limited by sex, limited by ethnic background or race, and limited by religion. I'd like to pick up a point that you raised that struck me as both interesting and depending a little bit on how we characterize it right, whether it's a group depends at least in part on how the persecutor perceives it. Not necessarily how the group itself might perceive it or how we might define it from the outside, but if the persecutor characterizes a particular or assembles a particular set of characteristics and then based on those characteristics does the persecuting or the harm, then that may be a factor for considering it a group. I think that's a version of what you said, and it appears from the record here that the authorities consider this group of homeless children on the streets in Honduras to be a group, and they go after them. The record, I mean, I don't want to be too hyperbolic about it, but it sounds as though they treat them as if they were stray dogs. Well, yes, but you still have to say is that a group that's recognizable in the asylum laws. Of course. The government going after particular groups around the world is nothing new, and we don't deny that this is a problem in Latin America or any country where there is widespread poverty. Any government is going to be embarrassed and put out by having large numbers of people on the streets. This country, the government restrains itself. Other countries it doesn't. That doesn't mean that anyone on the street in any particular country is and who may be targeted by the government should be a member of a group that is eligible for asylum in this country. To get back to asylum, Judge Tolman, your question about humanitarian asylum. Yes. I wasn't going to let you sit down without addressing that. I didn't think I'd make it back to the table without that. That's an interesting point. Well, two points, first of all. The IJ may have made that determination, but, of course, the Board didn't. So you don't have it before you. That's why. What does it mean? I mean, I've heard that term over the years, but I've never understood what the practical effect of it is. I'm sorry. It means that you were persecuted so horrendously while you lived in your home country that you should not be required to return there, even if the conditions that led to your persecution no longer apply. It's granted without regard to the well-founded fear part of the asylum equation. The classic case, and I think this illustrates why that doesn't apply here, was a Board decision in a case called Matter of Chen. Chen was the son of a family who was persecuted by the Red Guards during Mao's Cultural Revolution. And he was a youth, and he watched his father beaten tremendously, humiliated, paraded through the streets, and eventually murdered by the Red Guards. He came to this country, applied for asylum, and the question was, well, that was awful. But the Cultural Revolution has been over for many years. The Red Guards don't exist anymore. Why do you have a well-founded fear of returning to China now? And the immigration judge and the Board in that case applied their authority, which is in the asylum regulations, to say to Mr. Chen, we will offer you shelter in this country based on your past experiences alone. It would be inhumane and psychologically damaging to require you to return to China under these circumstances. Nothing like that applies here, nothing like that at all. And I think that my red light is on. The Court's been very generous.  Certainly, Your Honor. And that is, as you may be aware, I was on a panel with Judges Kashima and McHugh in Seattle earlier this year, and we had a case in which the question was, essentially the question that had been presented to the Third Circuit, that is to say, is in a social group defined as Honduran street children who have refused to enter gangs, and we recognized that the Third Circuit had remanded to the Board to get an answer to that question, and we withdrew submission of that case in Seattle because we thought precisely the same question, and we were just going to wait for the answer from the Board based on the Third Circuit remand. This is a related but distinct group here. Would it be worth our while to wait for the Board decision in that Third Circuit case? Oh, I mean, what are we likely to learn? I'm not sure, Your Honor. I expect that the Third Circuit was acting on the basis of its previous decision in Lugwago, which we cite in our brief and which I happened to litigate in the Third Circuit. In that case, the petitioner had been a child soldier in Uganda kidnapped by the Lord's Resistance Army and forced to serve in the Lord's Resistance Army and do horrendous things. He sought asylum here in the United States. We won most of the Lugwago case because we pointed out that his proposed social group was child soldiers who served in the Lord's Resistance Army, and we pointed out again there that he was no longer a child. He's aged out. And the Third Circuit agreed with us. The wrinkle in the case was that after coming to the United States, Mr. Lugwago had become a media figure here in the United States, invading against the Lord's Resistance Army, and his argument was, I am now identified as a political opponent, not a social group member, a political opponent of the Lord's Resistance Army. If you send me back, I will be targeted by them. I will be murdered. And the Third Circuit ---- Your time is running. So if you could get to the question ---- No. I will, Your Honor. How likely is it we're going to learn anything from the board in that case that might be useful to us in this case? On the facts of this case, Your Honor, on the facts of this case, I would say none at all. But on the question as to whether or not Honduran street children are a cognizable social group. Well, I suppose it's possible, Your Honor. If the board issues a published precedential decision that makes ---- that reaches that limited question, then, yes, you may have guidance that you should be waiting for. And do we know whether the board is likely to give us a full precedential decision in that case? I don't know, Your Honor. We just don't know. I can't answer that. Are there any further questions? I thank the Court for its attention. Thank you very much. Why don't we start out giving you two minutes and see what happens. Okay. Thank you very much, Your Honor. Last point first. The case of Valdebezio-Galdamez in the Third Circuit, I believe that's the case that Your Honor is referring to, defines their particular social group as young Honduran men who have been actively recruited by gangs and who have refused to join the gangs. And that question is sent back to the board. I do think it would be beneficial for this Court to wait for the board's ruling because I think that's exactly what happened here. We've defined it as part of this case. Exactly. I think that Dennis, as you can see from the record, on the advice of his grandfather, refused to join gangs and he's been persecuted on that basis. With respect to humanitarian grant, Your Honors, I don't have anything to add except that the record at pages 6, 37, and 38, sets forth the IJ's reasoning of why he felt that humanitarian aid was appropriate here. The issue of Honduran street children with respect to Valdebezio-Galdamez also bleeds into one of the government's arguments about breadth. And the government keeps harping on the fact that this, that breadth is a key factor based on numbers. But as the case cited by the government states, Iselo Gomez, page 8, note 2, it's not based on numbers. As this Court held in San Chile Trujillo, no one would argue that this country's asylum law should prohibit millions of Jews fleeing Germany from being held back just based on the fact of their numbers. Instead, those cases focus on the contours of large groups. In other words, the disparity of shared characteristics that are inherent in such large and diverse groups. And we submit that the disparity does not exist with respect to Honduran street children. This was the key issue in Escobar, and it's the reason why this Court shouldn't follow Escobar. The Court there felt the central thrust of the opinion was that the petitioner did not show that Honduras is worse than hundreds of other locations across the globe with respect to street children. But unlike Escobar, the record here clearly establishes that Honduras uniquely facilitates persecution of street children. So we're not going to be opening the floodgates here, Your Honors. I would point you to page 150 of the record. Honduras has unique problems of the 1996 U.S. policy of deporting Honduran gang members back there. 1998 Hurricane Mitch affected Honduras more than any other country, and it devastated it. It set 75 percent of its infrastructure. The end of Honduras' mandatory draft made it so that teens are on the streets everywhere. And the record is replete with evidence that Honduras is different than any other country, unlike the petitioner in Escobar, what the petitioner there could not prove. I see my time is up. You've got a final point, please. Yes. I just briefly, Skidmore, that's briefed. No precedential power here, Your Honors. I think you might like Skidmore. It's 3-1. Your favor. I just wanted to address the issue the government keeps raising about this group not being voluntary. But the government focuses on whether it would be voluntary to submit yourself to persecution. That's not the point here. As Your Honors pointed out with Mohammed, it paid at $7.98. The point is that these children seek out groups voluntarily to survive, survive sexual exploitation, starvation, and other horrors that are on the streets. And the board at the record page 206, matter of law, has recognized that this group is a valid group in the past. So with that, Your Honors, if you have no further questions. Thank you very much. I particularly wish to thank you for doing this as pro bono. This is a pro bono appointed counsel doing this for free, and we very much appreciate the lawyers who do that in cases like this. Thank you, Your Honors. So thanks both sides for very good arguments. The case of Flores-Cruz is now submitted for decision. Next case on the argument calendar is United States v. Morocco.
judges: W. Fletcher, Tallman, Bertelsman